Steven Anthony BUTLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 70745.

Court of Criminal Appeals of Texas, En Banc.

March 9, 1994.

Andrew L. Jefferson, Jr., Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Winston E. Cochran, George Lambright, Belinda Hill and Maria Hayes, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

A jury convicted appellant of capital murder, pursuant to TEX.PENAL CODE ANN. § 19.03(a)(2). The jury then returned affirmative answers to the three special issues [submitted to it] at the end of the punishment stage of the trial. See TEX.CODE CRIM.PROC.ANN. Art. 37.071(b)(1), (2) & (3). The trial court assessed appellant's punishment at death. Direct appeal to this Court was automatic. Id., § (h). We will affirm.

In ten points of error[1], appellant argues: the trial court erred when it refused to dis-

---

1. In his sixth point of error, appellant contended the trial court committed reversible error when it

miss the jury array; the trial court erred in granting two of the State's challenges for cause; the trial court erred when it refused to charge the jury on the issue of the voluntariness of appellant's confession; the trial court erred when it admitted the testimony of the medical examiner, Dr. Narula, during punishment; the trial court erred in refusing to instruct the jury to disregard the testimony of Franzes Hartman at punishment; the Texas Death Penalty Statutes, as applied to appellant's cause, violate the Eighth and Fourteenth Amendments of the Texas Constitution; the trial court erred when it failed to provide an instruction at punishment so the jury could give consideration to appellant's mitigating evidence; and that appellant's trial counsel were unreasonably ineffective. The majority of these points of error will be addressed in the order in which they occurred during the course of trial. Because appellant does not contest the sufficiency of the evidence, a detailed review of the facts is unnecessary.

The State proved at trial that appellant, on August 27, 1986, entered a dry cleaning store on Woodforest Boulevard in Harris County and demanded that the female cashier give him the store's money. Appellant was armed with a handgun. The cashier was Velma Clemons. Clemons resisted appellant's attempt to rob her. Appellant then threw her to the floor and shot her. The State proved that Clemons died as a result of a gunshot wound to her abdomen that penetrated her liver, destroying it. At punishment, the State proved that appellant committed seven extraneous offenses prior to the commission of the instant offense.

■ In his third point of error, appellant argues the trial court "committed reversible error in refusing appellant's request that the jury array be dismissed after the trial court sustained a *Batson* [2] challenge pursuant to Article 35.261, Texas Code of Criminal Procedure." A review of the method by which the trial court conducted voir dire supports the conclusion that the trial court did not err.

First, all of the prospective jurors who were called were divided into smaller groups. General instructions were given to these groups as they were reached. The first group consisted of six people.[3] Out of this group, one juror, Melissa McMillan, was selected to sit on the jury. The next group only consisted of two persons. One of them, Thomas Brewer, was selected to serve. The third group was comprised of five people and one, Hubert Taylor, was selected for service. After the general instructions were given to the fourth group, the first person in this group, Jimmie Lewis, was selected for service. The State then exercised a peremptory challenge against the second person in this group, Delores Hadnott. Like appellant, she happened to be African–American. The challenge to Hadnott is the focus of appellant's third point of error.

Appellant argued the State was exercising the peremptory strike on Ms. Hadnott in a racially motivated manner, in other words, against the provisions of *Batson* and TEX. CODE CRIM.PROC.ANN. Art. 35.261. The trial court then allowed the State to explain

---

failed to file findings of fact and conclusions of law regarding the outcome of a hearing on the voluntariness of appellant's confession. Pursuant to this point of error, this Court abated the instant appeal and remanded to the trial court to make the appropriate findings and conclusions. *Butler v. State*, 790 S.W.2d 661 (Tex.Cr.App. 1990). The trial court complied with this order. Therefore, the sixth point of error is now moot.

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3. The State, appellant and the trial court comment that the group of persons called for service in this case were divided into smaller groups of eight. Each of these smaller groups were then called, one at a time, into the trial court for voir dire. However, the record reflects that the trial court repeated the same general questions and instructions [see TEX.CODE CRIM.PROC.ANN. Art. 35.17, § 2.] four times before the juror at issue in point of error three, Delores Hadnott, was reached. The manner in which the trial court gave each group its Art. 35.17 instructions, along with the record of voir dire, suggests that the first four groups were comprised as such: group one, six persons; group two, two persons; group three, five persons; and group four, six persons. Delores Hadnott was in the fourth group. Although all the persons in the fourth group were not listed in the record, it can be determined from the record that it was comprised of six persons.

its motivation for using the strike. The trial court sustained appellant's *Batson* argument.

After he sustained appellant's *Batson* argument, it appears the trial court was uncertain of the proper method available to him to remedy the situation. Appellant argued that the trial court could either dismiss the six persons in the Hadnott array or seat Hadnott. The judge reserved ruling and asked appellant and the State to research the law and present it to him the next day.

The next morning, the judge entertained arguments on the available remedies for the State's violation of *Batson*. Instead of requesting the trial court seat Hadnott on the panel, appellant requested the trial court to call a new "array" pursuant to TEX.CODE CRIM.PROC.ANN. Art. 35.261. Appellant initially appeared uncertain of the meaning of the term "array", and asked that the court "dismiss the array, whatever the court considers the array to be."

The trial court found that this request was not specific enough and told appellant that the court believed that the array "was the last panel of eight persons of which this particular juror was a member of." [4] Appellant then stated that he had researched the meaning of the term and could not find a definition. In the absence of one, he requested that "the entire panel of jurors—all jurors that had been called for this case—be dismissed and we start from the beginning, regretfully."

The court then repeated its ruling that appellant had presented a prima facie case of racial discrimination, that the State had failed to give a race-neutral explanation for the strike, and that the court was then faced with the option of calling a new "array," which was the remedy chosen and requested by appellant under Art. 35.261.

However, **the trial court believed that "array" meant only the eight juror group of which Ms. Hadnott was a member.** The trial court then stated that he would dismiss the four remaining jurors in Ms. Hadnott's "panel," excuse the juror who had been se-

lected for service from that group (Jimmie Lewis), and return to the parties any peremptory challenges used during voir dire of the "Hadnott group", thereby returning the State and appellant to the positions they enjoyed before the "Hadnott group" had been called.

Appellant continued to argue that "array" meant all of the jurors who had been called for service and he objected to the trial court's decision to only dismiss the Hadnott panel of eight. After noting appellant's objection, the trial court excused only the "Hadnott group" of eight jurors. It did *not* excuse the other three persons (McMillan, Brewer and Taylor) who were selected to sit on the jury prior to the calling of the Hadnott group. The trial court then continued with the list of jurors it had been originally given for the case and called in the next group.

The definition of an "array" for the purposes of Art. 35.261 and *Batson v. Kentucky* represents the issue at the heart of appellant's third point of error. Art. 35.261 sets out:

> "After the parties have delivered their lists to the clerk under Article 35.26 of this code and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call for a new array in the case. **The court shall grant the motion of a defendant for dismissal of the array** if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race."

In the instant capital case, Art. 35.261 fails to apply to the voir dire procedure followed by the trial court. Unlike a non-capital trial, which Art. 35.261 appears to have been writ-

---

4. See footnote 3, supra. Apparently, this meant the group that began with juror Lewis, who immediately preceded Ms. Hadnott.

ten to control,[5] appellant and the State did not wait until the completion of the voir dire of the entire venire to submit the lists of their peremptory challenges to the trial court so that all twelve jurors could be seated at one time and impanelled. Unlike a non-capital trial, the trial court did not conduct voir dire of the entire venire in only one group, so that all of the *Batson* challenges to the entire jury could be made, examined and ruled upon at the same time.

Instead, the trial court employed a voir dire procedure tailored to fit a capital murder trial. It split the venire into many, separate, and smaller groups so that voir dire could be conducted of each group separately and apart from the other groups.[6] After the general instructions were given to each of the mini-panels by the trial court, every venireperson was individually questioned by the parties. Also, if a party chose to exercise a peremptory challenge, it did so during, or immediately after, the voir dire of an individual venireperson was completed. A *Batson* challenge to a venireperson was resolved after the voir dire of that person. Neither party argued that this procedure was inappropriate or objectionable.

We also find that this entire procedure falls outside the scope of the remedy set down by the Legislature in Art. 35.261. We conclude that Art. 35.261 cannot control disposition of this point of error. The question remains whether the remedy fashioned by the trial court satisfied the commands of *Batson*.

In *Batson v. Kentucky*, the Supreme Court sought to require trial courts "to be sensitive to the racially discriminatory use of peremptory challenges." *Batson*, 476 U.S., at 99, 106 S.Ct., at 1724. However, it did not set forward a particular procedure to be followed by trial courts. The Court left open to the

discretion of the trial courts of the states "how best to implement our holding." *Batson*, 476 U.S., at 100, fn. 24, 106 S.Ct., at 1725, fn. 24. This meant permitting the trial courts to choose the appropriate method in each particular case, whether it be selecting a jury from a group not associated with the racial discrimination in the case, or by reinstating the improperly challenged jurors on the venire. *Batson*, id.

In the instant case, at the urgings of appellant, the trial court chose not to seat Ms. Hadnott as the fifth juror. Instead, the trial court chose to dismiss the Hadnott "array." In doing so, the trial court removed Lewis as the fourth juror from the panel in the course of dismissing all of the Hadnott array, and returning the parties to the positions they were in before that group was called to the trial court for voir dire. We hold that this satisfied the directive of *Batson* to find the most satisfactory method in the instant case to preserve appellant's rights to equal protection. The trial court achieved this by eliminating the group from jury selection that was directly associated with the State's racially discriminatory use of a peremptory challenge on Hadnott. We find that the trial court did not commit reversible error when it chose to dismiss the Hadnott "array" instead of the entire venire. Point of error three is overruled.

■ In his fifth point of error, appellant complains "the trial court committed reversible error in granting the state's challenge for cause and excusing Scott Simmons, a prospective juror." Appellant states that Simmons was excused on the State's challenge for cause because "he stated that he could not convict on the basis of a defendant's confession alone." Appellant argues that if the law requiring the corroboration of a confession had been adequately explained

---

5. This opinion is not written to conflict with this Court's decision in *Rousseau v. State*, 824 S.W.2d 579 (Tex.Cr.App.1992), regarding the timeliness of a *Batson* objection.

6. In *Hall v. State*, 661 S.W.2d 113 (Tex.Cr.App. 1983), this Court implicitly approved the practice of conducting voir dire through the use of mini-panels. "We also find little significance in the fact that rather than an entire panel of 72 persons, or some other such number, being assigned

to and seated in a courtroom. that instead, three groups of 24 persons each were assigned to and seated in the courtroom in which appellant was tried." *Hall v. State*, at 115.

This practice of dividing the venire into mini-panels is not an uncommon practice. See, also, *Rousseau v. State*, 855 S.W.2d 666, at 675 (Tex. Cr.App.1993), in which the trial court employed this same procedure without objection.

to Simmons, then he would not have been challengeable and the State would have been required to exercise one of its peremptory challenges to remove Simmons from the panel.

However, appellant raised no objection to the removal of Simmons from the panel. His failure to object waived any alleged error with regard to the trial court's decision to excuse Simmons. *May v. State,* 738 S.W.2d 261, at 269 (Tex.Cr.App.1987), *cert. denied* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 158 (1987); and cases cited therein.

■ In addition, we have examined the record of Simmons' voir dire testimony. Simmons explained that he could not vote to convict based only on a confession, that he would also want "an eyewitness or something." In response to a State-posed hypothetical, Simmons stated that he could not vote to convict a defendant based only on a defendant's valid and admissible confession to the robbery and murder of a convenience store clerk and the sole corroboration that a robbery and murder of a clerk had occurred on the date and at the location described by the defendant in his confession. This established Simmons' inability to follow the rule that a conviction can be had based upon a defendant's extra-judicial confession and independent evidence tending to establish the corpus delecti. See *Fisher v. State,* 851 S.W.2d 298, at 302–303 (Tex.Cr.App.1993), and cases cited therein.

Appellant's argument that someone should have given Simmons a proper statement of the law, that the law requires the State "to corroborate a confession and to prove the corpus delecti," is in error. The only corroboration necessary is proof tending to establish the corpus delecti. This is what the State sufficiently explained to Simmons in the hypothetical. The trial court did not err when it granted the State's challenge of Simmons. Appellant's fifth point of error is overruled.

■ In his fourth point of error, appellant contends "the trial court committed reversible error in sustaining the State's challenge for cause in the case of Cynthia Lee, a prospective juror." Appellant argues that

the record does not support the trial court's decision. He alleges the entire record reveals Lee would not hold the State to a higher burden of proof than was required by law, and, therefore, she did not have a bias or prejudice against a phase of the law upon which the State was entitled to rely. TEX. CODE CRIM.PROC.ANN. Art. 35.16(b)(3).

We note that traditional *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), analysis is inapposite to resolution of the propriety of an excusal for cause pursuant to TEX.CODE CRIM.PROC.ANN. Art. 35.16(b)(3). In *Garrett v. State,* 851 S.W.2d 853 (Tex.Cr.App.1993), this Court explained that both *Adams* and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985),

"speak of whether a venireman has conscientious scruples against the death penalty which would substantially impair a venireman's ability to perform his duties.... except to the extent they stand for a proposition that any bias against the law sufficient to render a venireman "substantially impaired" will justify a State's challenge for cause, these cases are inapposite."

*Garrett v. State,* n. 5, at 860.

■ In reviewing an excusal for cause pursuant to Art. 35.16(b)(3), "we must accord due deference to the trial court's determination given its position to gauge the juror's sincerity and demeanor." *Montoya v. State,* 810 S.W.2d 160, at 167 (Tex.Cr.App.1989); *Barnard v. State,* 730 S.W.2d 703, at 714 (Tex.Cr.App.1987), and cases cited therein, *cert. denied,* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988). The trial court is in a unique position to determine whether those biases and prejudices would prevent or substantially impair the venireperson's performance as a juror. *Cf., Farris v. State,* 819 S.W.2d 490, at 501 (Tex.Cr.App.1990). Regarding the excusal for cause of Lee, this Court, deferring to the judgment of the trial court, will focus on whether Lee evinced a bias or prejudice against a phase of the law upon which the State is entitled to rely to an extent that the trial court could conclude Lee would be substantially impaired.

Lee gave conflicting answers throughout her voir dire which indicated either that she would hold the State to a burden of proof greater than beyond a reasonable doubt, or that she would only hold the State to that burden and nothing more. Lee explained to the State that since a person's life was at stake in a capital case, she felt the burden of proof should be higher than in "a normal case." The attorney for the State then explained to Lee that the burden of proof was the same in all cases. Even though she said that she understood, Lee maintained that "you would still have to look at the fact that the proof would have to be more [sic] higher, because you are putting someone's life in your hands. It isn't like you can make a mistake on something like that." Lee also stated:

"Well, they would have to prove to me on the highest level. I would really have to know deep down inside that they really proved it to me, and there is no other questions in my mind that can say—pull a doubt of any kind that he is innocent for me to say that he is guilty."

When the State concluded by asking Lee if she would hold the State to a higher burden of proof in a capital case, she replied "yes."

When the defense questioned Lee in an effort to rehabilitate her, she waivered slightly on her previously resolute opinion. She told appellant that she understood the State was not required to prove anything more than beyond a reasonable doubt. However, she then explained that she still believed she would hold the State to a higher burden of proof than if appellant was charged with a lesser crime.

At this point, the trial court intervened in an effort to get a "yes or no answer." He asked Lee if she would require the State "to put proof to you beyond a reasonable doubt in a capital murder case, yes or no?" Lee responded "yes." The following then occurred:

TRIAL COURT: "Okay. All right. I grant the motion [the State's challenge for cause]. You can be excused."

LEE: "Yes."

TRIAL COURT: "You understood?"

LEE: "Yes."

TRIAL COURT: "All right. I grant the motion. You can be excused."

LEE: "Okay. Thank you."

Appellant made no objection.

There is support for the trial court's decision to excuse Lee in the record of the voir dire. When questioned by the State and, at times, by appellant, Lee indicated that due to the seriousness with which she viewed capital proceedings, she would hold the State to a higher burden of proof. Deferring to the trial court's position to gauge the juror's sincerity and demeanor, *Montoya v. State*, 810 S.W.2d, at 167; and *Barnard v. State*, 730 S.W.2d, at 714, we conclude that Lee's proclivity to hold the State to a higher burden of proof rendered her properly excusable for cause. *Jackson v. State*, 822 S.W.2d 18, at 28 (Tex.Cr.App.1990); *Jacobs v. State*, 787 S.W.2d 397, at 404 (Tex.Cr.App.1990), *cert. denied* 498 U.S. 882, 111 S.Ct. 231, 112 L.Ed.2d 185 (1990); and *Little v. State*, 758 S.W.2d 551, at 555 (Tex.Cr.App.1988), *cert. denied* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988).

In addition, appellant's failure to object to the excusal of Lee waived any alleged error. *May v. State*, 738 S.W.2d, at 269. Appellant's fourth point of error is overruled.

■ In his ninth point of error, appellant contends that the trial court committed reversible error in refusing to charge the jury on the issue of the voluntariness of a confession given by him to Sergeant J.J. Freeze of the Harris County Sheriff's Department. Specifically, he believes that there was evidence of physical injuries which raised the issue that the confession was possibly coerced.

The court conducted a *Jackson/Denno* hearing after voir dire was completed. Appellant testified that at the time of his confession he was threatened with physical force if he did not sign the confession. He further alleged that he was struck with a chair by one of the officers who was present. The officers testified physical force was neither threatened or used against appellant if he did not sign the confession. At the conclusion of the hearing, the trial court ruled that the

confession was not coerced and that it would allow its introduction at trial. While it did not initially make findings of fact and conclusions of law about the voluntariness of the confession, they were later filed as a supplement to the record (see note one, supra). The trial court found that the confession was made voluntarily and that no threats of violence were used.

Sergeant Freeze, the officer who took appellant's confession, testified at guilt/innocence that appellant had a bruise on his forehead and a small bandage on the side or back of his head at the time appellant gave his confession. He also testified that appellant was given *Miranda* warnings during the interview and never requested to speak to an attorney. While there was no evidence presented to the jury to refute this, appellant's trial counsel urged that the mere fact that *Miranda* warnings were discussed raised the voluntariness issue. He therefore requested a voluntariness instruction. He believed it raised the issues of "whether or not it was signed, whether or not it was read by the defendant (and) whether or not he was told that he had a right to an attorney ..." Appellant's trial counsel never stated that he believed that appellant's physical condition at the time of the interview raised the issue that force was used to obtain the confession.

■ A timely and reasonably specific objection is required to preserve error for appellate review. TEX.R.APP.P. 52(a). Additionally, appellate arguments must correspond with the objection at trial. See *Fuller v. State*, 827 S.W.2d 919, at 928 (Tex.Cr.App. 1992). If they do not, no error is preserved and they are waived. *Id.*

Appellant argued at trial that the issue of voluntariness arose merely by the fact that the issue of *Miranda* warnings was discussed. He did not argue that the statement was obtained through the use of physical threats or force. Consequently, his trial objection does not match that made on appeal. See *Fuller*, supra. Although we find that he failed to preserve error, we will address his argument in the interests of justice.

■ Art. 38.22, Sec. 7, V.A.C.C.P. provides that where the issue of voluntariness of a confession is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement. However, before the requested instruction is required, some evidence must be presented to the jury which raises the issue of voluntariness. *Hernandez v. State*, 819 S.W.2d 806 (Tex.Cr.App.1991); *Wagner v. State*, 687 S.W.2d 303 (Tex.Cr.App.1984); *Brooks v. State*, 567 S.W.2d 2 (Tex.Cr.App. 1978). The trial judge is sole judge of credibility of witnesses in a pretrial hearing and, absent a showing of abuse of discretion, a trial court's finding on the voluntariness of a confession will not be disturbed. *Long v. State*, 823 S.W.2d 259 (Tex.Cr.App.1991).

■ Appellant now argues that his physical injuries raised an issue concerning the voluntariness of the confession. There is nothing in the record to support this allegation. While appellant asserted at the *Jackson–Denno* hearing that he was physically threatened to sign the confession, the findings of fact and conclusions of law entered by the trial court found the interrogating officers more credible. Since there is evidence in the portion of the record documenting the *Jackson/Denno* hearing to support the trial judge's decision to admit the confession, we will defer to the court's ruling. *Long*, supra.

We further find that there was no testimony before the jury which raised the issue that the confession was obtained through the use of physical force. Unlike the *Jackson–Denno* hearing, appellant elected not to testify at guilt/innocence. Trial counsel did not raise the issue of physical force when requesting the instruction, but rather stated that it was the testimony of Sergeant Freeze concerning the *Miranda* warnings and appellant's decision not to request an attorney that raised the issue. Appellant presented no evidence during trial to refute Sergeant Freeze's testimony. Furthermore, Sergeant Freeze testified that the injuries were present at the time he interviewed appellant. There is nothing in the guilt/innocence portion of the record to support the allegation that they were sustained during the interview. We therefore find that there was no evidence which placed the issue of voluntariness of the confession before the jury. *Brooks*, supra.

Consequently, we hold that the trial court did not err by denying appellant's request for a voluntariness instruction. Point of error nine is overruled.

■ By way of point of error seven, appellant argues that the trial court committed reversible error in admitting the testimony of Dr. Harminder Narula, an Assistant County Medical Examiner and State's Exhibits Nos. 50 and 66 sponsored by Dr. Narula, since Dr. Narula's testimony violated the hearsay and best evidence rules.

Dr. Narula was called to testify during punishment about an extraneous offense committed by appellant. Narula discussed the autopsy results of Jefferson Edward Johnson, a gentleman who was killed during a convenience store robbery. The robbery was introduced against appellant as an extraneous offense during the punishment phase. Dr. Narula based his testimony on an autopsy report prepared by another assistant medical examiner of the Harris County Medical Examiner's Office. While a bullet recovered and a photograph taken during the autopsy (State's exhibits 50 and 66, respectively) were tendered and admitted into evidence, the complete report was not. Additionally, the employee who prepared the report had retired by the time of trial.

Appellant urges in his brief that the primary objection made by his trial counsel was "essentially a hearsay objection, i.e., that Dr. Narula had not made the report and should not be permitted to testify from it." The record reflects that three objections were made during Dr. Narula's testimony. When the State attempted to admit a bullet recovered during the autopsy, the objection was as follows:

"Your honor, we would object to State's Exhibit No. 50. We are renewing our objections regarding extraneous offenses. And since this is not the doctor that did the examination, we object on that basis, Your Honor."

Additionally, when the State attempted to introduce a photograph which was part of the autopsy report, appellant made the following objection:

"Your honor, we would object to State's Exhibit no. 66, based on the extraneous offense objections that we've been making in a continuous manner and that the exhibit has no probate (sic) value, that is designed only for the purposes of inflaming the jury, Your Honor."

Finally, appellant made this objection when Dr. Narula was asked whether, based on the contents of the autopsy, he could trace the path of a bullet discussed in the report:

"Excuse me, Your Honor, before he answers, may we have a running objection based on our statement that this is not the doctor that did the exact examination and he's testifying from what some other doctor did and—so that I won't jump up each time he's asking a question, may we have a running objection on that point?"

A reasonably specific and timely objection is necessary to preserve error for appellate review. TEX.R.APP.PROC. 52(a); *Turner v. State*, 805 S.W.2d 423 (Tex.Cr.App.1991). The word "hearsay" never appears in appellant's trial objections. We therefore find that the objection was not reasonably specific as required by TEX.R.APP.PROC. 52(a) and error was not properly preserved. However, in the interests of justice we will address appellant's argument as if the alleged hearsay error was properly preserved.

■ While the autopsy report was never admitted into evidence, a proper predicate was established at the beginning of Dr. Narula's testimony. He testified that: 1) he had care, custody, and control of the records of the Harris County Medical Examiner's Office; 2) that those records were kept in the regular course of business; 3) that the entries in the records were made by someone with personal knowledge of the events; and 4) that the entries were made at or near the time of the event which is recorded in the records. He further stated that autopsies were included among the reports prepared by the Harris County Medical Examiner's Office.

An autopsy is a report of a public office which sets forth matters observed pursuant to a duty imposed by law. Tex.R.Crim.Ev. 803(8)(B); *Garcia v. State*, 868 S.W.2d 337

(Tex.Cr.App.1993). An autopsy is not, however, a report prepared by law enforcement personnel. *Garcia,* supra; *Cf. Cole v. State,* 839 S.W.2d 798 (Tex.Cr.App.1992) (report by Department of Public Safety chemist was prepared by law enforcement personnel). It is therefore admissible into evidence as an exception to the hearsay rule under the public records provision of Tex.R.Crim.Ev. 803(8)(B). *Id.*

We find that the autopsy of Mr. Johnson would have been admissible into evidence under the public records exception to the hearsay rule. Tex.R.Crim.Ev. 803(8)(B); *Garcia,* supra. Therefore we also hold that Dr. Narula's testimony concerning some of the contents of the autopsy report was not subject to a hearsay objection.

■ Without determining whether it was error to admit the photograph and the bullet, we find that it would have been harmless if there indeed was error. TEX.R.APP.P. 81(b)(2). During punishment, another photograph was introduced which showed Mr. Johnson's body when it was discovered at the convenience store shortly after the robbery. Moreover, we do not believe that the mere introduction of the bullet into evidence was especially prejudicial to appellant. The testimony surrounding the item attached no special significance to it other than establishing that it was the bullet recovered during the autopsy in question.

Other evidence presented at punishment supports a finding that the admission of the photo and the bullet, if error, was harmless. Several other witnesses testified concerning the murder of Mr. Johnson, including the person who discovered his body after the robbery, the victim's wife, and an officer who was at the scene and a former co-worker of Mr. Johnson. A confession given by appellant shortly after the crime was also introduced into evidence. Through another confession and additional witnesses, it was further proven that appellant had been involved in at least two other aggravated robberies of convenience stores. Therefore, given the amount of other evidence documenting the murder of Mr. Johnson and the extraneous offenses, we find beyond a reasonable doubt that the admission of the photograph and the bullet did not contribute to the punishment. TEX.R.APP.P. 81(b)(2).

■ Appellant further argues that Dr. Narula's testimony should not have been permitted since it was not the "best evidence." However, it cannot be determined from his brief whether appellant believes that the testimony is not the best evidence of the extraneous offense, of the results of the autopsy, etc. ... Regardless of the intended argument, we find that the trial court has discretion to admit any evidence which it deems relevant during the punishment phase of a capital murder trial. Art. 37.071, V.A.C.C.P. We will therefore defer to the trial court's discretion and find this aspect of appellant's argument meritless.

For the aforementioned reasons, we find appellant's hearsay and best evidence arguments unpersuasive. Point of error seven is therefore overruled.

■ In point of error eight, appellant alleges that the trial court committed reversible error during the punishment phase by refusing to instruct the jury to disregard the testimony of Franzes Hartman after the court sustained an objection to an in-court identification by the witness.

During punishment, Ms. Franzes Hartman was called by the State to testify concerning appellant's prior conviction for robbery and aggravated sexual assault. This incident took place while she was on duty at a convenience store in Winnie in September of 1986. After her testimony describing the crime, the State remarked that it was about to have her identify appellant as the perpetrator. Appellant then took her on voir dire and it was revealed that the day after the incident, Ms. Hartman was unable to identify appellant from a photo line-up. However, it was also revealed that she had identified appellant as the perpetrator on two prior occasions, including his actual trial for the convenience store robbery. After the voir dire was complete, appellant objected to the identification which was to be made by the witness. The court sustained the objection because it believed it was not necessary since the witness had already twice identified appellant during two other trials. Appellant then motioned

that the jury be instructed to disregard all prior testimony concerning the robbery and aggravated sexual assault. He contended that the pen packet documenting the conviction was the best evidence and should be introduced rather than allowing the witness to testify about the incident. The objection was overruled because the trial court believed the State had a right to put on a live witness. During her testimony, Ms. Hartman never identified appellant in front of the jury as the perpetrator of the crime she was describing. When the witness was excused, the State introduced the pen packet for the conviction for the convenience store robbery and aggravated sexual assault. It also introduced a court of appeals opinion affirming the conviction. Later during the testimony of another witness, a confession made by appellant at the time of the convenience store robbery and sexual assault was introduced over appellant's "voluntariness" objection.

Appellant now complains that the jury should have been instructed to disregard the witness' testimony. He argues that before evidence of an extraneous offense is admissible, the State must clearly show that the defendant on trial was the perpetrator of the extraneous offense. *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App.1974). Appellant urges in accordance with *Ransom* that the inability of Ms. Hartman to identify appellant from the photo line-up reflects that she was unable to identify him as the perpetrator of the offense.

 The trial court has wide discretion at the penalty stage of a capital murder trial in admitting or excluding evidence. Art. 37.071, V.A.C.C.P.; *Allridge v. State,* 762 S.W.2d 146, at 162 (Tex.Cr.App.1988). Any evidence which is relevant to the punishment may be admitted. *Id.* However, where error is found in the admission of such evidence, the judgment shall be reversed unless it is determined beyond a reasonable doubt that the error made no contribution to the punishment. TEX.R.APP.PRO. 81(b)(2); *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989).

We find that it was error to refuse appellant's requested instruction directing the jury to disregard Ms. Hartman's testimony. The trial court did not allow the witness to identi-

fy appellant as the perpetrator of the offense which she described. Consequently, the jury could not connect appellant to the events which were the subject of Ms. Hartman's testimony. Since appellant was not identified as the perpetrator of the offense, the jury should have been told that the corresponding testimony should have also been disregarded. However, we find that such error was harmless. The jury had ample evidence before it which connected appellant to the crime described by Ms. Hartman. The pen packet documenting appellant's conviction was introduced into evidence. Additionally, the Court of Appeals opinion affirming the conviction was admitted into evidence. Finally, the confession given by appellant the day after the offense was introduced into evidence later during the testimony of another punishment witness. Given the amount of other evidence connecting appellant to the crime, we find beyond a reasonable doubt that the failure of the trial court to instruct the jury to disregard Ms. Hartman's testimony did not contribute to the punishment. TEX.R.APP.PRO. 81(b)(2). Consequently, point of error eight is overruled.

In point of error one, appellant presents a multifarious argument in which he contends that the Texas death penalty statute as applied to his case violates the Eighth and Fourteenth Amendments to the United States Constitution.

Appellant begins by alleging that Texas capital murder statutes and rules are unconstitutional under the rationale outlined in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). He argues that the statute is not carefully drafted so as to prevent imposition of the death penalty in an arbitrary and capricious manner. *Gregg* and *Jurek,* supra. Specifically, he contends that the statute should not provide for the court to give prospective jurors general instructions about the criteria for jurors in capital murder cases. He further alleges that the capital sentencing proceedings are unconstitutional because they do not define the terms "beyond a reasonable doubt", "probability", "criminal acts

of violence", "continuing threat to society", and "unreasonable (conduct) in response to provocation, if any, by the deceased".

■ A timely and reasonably specific objection is required to preserve error for appellate review. TEX.R.APP.PROC. 52(a). More particularly, failure to object to the court's instructions during voir dire waives error for appellate review. *See Boyd v. State*, 811 S.W.2d 105 (Tex.Cr.App.1991); *See Montoya v. State*, 744 S.W.2d 15 (Tex.Cr. App.1987).

■ Appellant failed to object to the court's instructions when they were given to the prospective jury members. Nor did he request that the terms which he identifies be defined. See *Montoya*, supra. We therefore hold that appellant did not preserve error and consequently overrule this aspect of point of error one.

■ Appellant further contends in point of error one that the Texas capital sentencing statutes as applied in his case are violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution. More specifically, he argues that unequal treatment results between capital and non-capital defendants because a jury in a capital case is permitted to consider unadjudicated, extraneous offenses at punishment where non-capital juries are not allowed to consider such evidence at punishment.

We have repeatedly held that the capital sentencing scheme which permits the jury to consider unadjudicated, extraneous offenses is not violative of equal protection afforded by the Fourteenth Amendment simply because it permits the jury to consider unadjudicated, extraneous offenses. *Jurek*, supra; *Paster v. State*, 701 S.W.2d 843 (Tex.Cr.App. 1985). Consequently, this aspect of point of error one is also overruled.

We find no merit in any aspect of appellant's first point of error. It is therefore overruled. Although there is an additional aspect of this point of error that addresses mitigating evidence which we also find meritless, we will discuss it in conjunction with point of error two since common issues are involved.

■ Appellant argues in point of error two that the trial court committed reversible error by refusing to instruct the jury that mitigating factors could be considered and also erred by failing to provide a means for the jury to express its consideration of the mitigating evidence presented by appellant. His final aspect of point of error one contends that the Texas capital sentencing procedures violate the Eighth Amendment to the United States Constitution in that the procedures do not provide an independent means by which the jury may express its consideration of mitigating factors offered by the accused.

Appellant believes that the jury should have been provided with a means to consider the mitigating effect of evidence he presented at punishment. First, it was proven that appellant was twenty-six years old when he committed the instant offense. Additionally, his parents were divorced when he was seventeen. Appellant also emphasizes the numerous witnesses who were presented at trial who he believes established that he had a reputation for good behavior prior to his arrival in Texas in 1984 or 1985. Finally, he points to his honorable discharge from the National Guard. He alleges that there is very little difference between his evidence and that presented by the defendant in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

■ Evidence of good character is within the scope of the special issues. *Gosch v. State*, 829 S.W.2d 775, at 786 (Tex.Cr.App. 1991). *Fuller v. State*, 827 S.W.2d 919 (Tex. Cr.App.1992); *Goss v. State*, 826 S.W.2d 162, at 166 (Tex.Cr.App.1992). Additionally, the United States Supreme Court has recently held that the special issues adequately provide a vehicle for the consideration of youth as mitigating evidence. *See Johnson v. Texas*, —— U.S. ——, at ——–——, 113 S.Ct. 2658, at 2669–2672, 125 L.Ed.2d 290 (1993).

The mitigating evidence presented by appellant is not the same as the evidence of mental retardation and severe childhood abuse presented by the defendant in *Penry*, supra. Unlike Penry's evidence, appellant's

evidence of good character was within the scope of the special issues. *Gosch, Fuller,* and *Goss,* supra. Furthermore, we question whether appellant's age of twenty-six at the time of the offense may actually be considered youthful; however, we find that if the jury needed to consider this evidence, the special issues allowed them to account for appellant's age. *Johnson,* supra. Since the jury was given a vehicle for expressing its reasoned, moral response to appellant's mitigating evidence, we find no violation of the Eighth Amendment to the United States Constitution. Point of error two is therefore overruled in all respects.

In appellant's tenth point of error, he argues that he was rendered ineffective assistance of counsel at trial. He directs our attention to eight examples of deficiencies in his counsels' representation which prove the performance of his trial counsel was "below the professional norm and was unreasonably ineffective and prejudicial." Appellant argues that the harm and prejudice which he suffered as a result of the totality of these incidents of ineffective assistance "cannot be found to have been harmless beyond a reasonable doubt on the issue of punishment."

Having reviewed the record before us, and considering the strict standards for determining that counsel was ineffective, we cannot say that appellant was rendered ineffective assistance. Appellant has not met his burden of proof.

■ The standard, for determining whether a defendant has been rendered ineffective assistance by counsel, was set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court explained in *Strickland* that a defendant making an ineffective assistance of counsel claim must show: (1) that his counsel's assistance was deficient; and (2) that but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S., at 693, 104 S.Ct., at 2067–2068. Additionally, since the Texas constitutional and statutory provisions do not provide any greater protection than the Federal provisions, Texas has adopted the *Strickland* two prong test. *Hernandez v. State,* 726 S.W.2d 53, at 57 (Tex.Cr.App.

1986); and *Hathorn v. State,* 848 S.W.2d 101 (Tex.Cr.App.1992).

In one example of an alleged deficiency, appellant contends that his trial counsel erred when he did not make clear to venireperson Scott Simmons what the law required for corroboration of a confession. Appellant believes that it was obvious that if the law had been "accurately" explained to Simmons, then Simmons would not have subject to a challenge for cause, and the State would have been forced to use one of its peremptory challenges on Simmons. In this argument, appellant presumes that the law requires the State "to corroborate a confession and to prove the corpus delecti."

As shown above in point of error five, appellant erroneously presumes the law requires more corroboration of an extra-judicial confession than is actually needed. As this Court explained above, the State accurately explained to Simmons that the only corroboration necessary is "independent evidence tending to establish the corpus delecti." *Fisher v. State,* 851 S.W.2d, at 302–303. The record of Simmons' voir dire showed that this was not enough for Simmons, who wanted more proof, "an eyewitness or something." Simmons was properly challenged for cause. Appellant's trial counsel was not deficient during the voir dire of Simmons.

■ In another example, appellant complains that his trial counsel was deficient during the voir dire of venireperson Cynthia Lee. Appellant bases this argument on his trial counsel's failure to object to the trial court's decision to grant the State's challenge for cause.

As seen above in point of error four, Lee maintained throughout her voir dire that she would hold the State to a higher burden of proof than that required by law. However, as seen above, after both parties had questioned Lee, the trial court intervened and asked Lee if she would require the State "to put proof to you beyond a reasonable doubt in a capital murder case, yes or no?" Lee responded "yes." Appellant's trial counsel did not object when the trial court then granted the State's challenge for cause.

As we explained in point of error four, the record provides support for the trial court's decision to excuse Lee. Lee indicated repeatedly she would hold the State to a higher burden of proof. In deference to the trial court's position to view and assess Lee's sincerity and demeanor, *Montoya v. State*, 810 S.W.2d, at 167; and *Barnard v. State*, 730 S.W.2d, at 714, we found Lee's proclivity to hold the State to a higher burden of proof rendered her properly excusable for cause. *Jackson v. State*, 822 S.W.2d, at 28; *Jacobs v. State*, 787 S.W.2d, at 404; and *Little v. State*, 758 S.W.2d, at 555. As a result, trial counsel's failure to object in this instance can not be seen as deficient assistance.

After the trial was completed, during a hearing to correct inaccuracies in the statement of facts, TEX.R.APP.PROC. Rule 55(a), appellant's trial counsel was called to testify regarding the voir dire of Cynthia Lee.[7] Trial counsel explained that during voir dire, when the State challenges a juror whom he does not want to sit on the jury so that he does not have to use one of his strikes, he will pass on making an objection. Trial counsel stated that if he had wanted the juror, he would have made a valid objection, even though he had no independent recollection of the voir dire of Lee. This Court cannot rule out the possibility that counsel purposefully did not object as a result of a conscious choice in order to further a calculated trial strategy. *Hathorn v. State*, 848 S.W.2d, at 120. In the instant case, the strategy likely was one of conserving his own peremptory strikes by allowing the State to secure a challenge for cause against a juror whom he did not want to sit on the jury. In either case, we do not find that trial counsel's performance during the voir dire of Lee was deficient.

In two other examples, appellant points to two separate occurrences during the voir dire of Melissa McMillan, who eventually was the first person selected as a juror. First, appellant argues that his trial counsel was ineffective because he did not use a peremptory challenge against McMillan.

Appellant bases his argument on the theory that McMillan was predisposed to assess the death penalty. During voir dire, McMillan stated that she knew members of the family of a victim of a violent crime. She felt the defendants in that case deserved the death penalty, but due to the fact that they had only been charged with kidnapping, they could not receive that penalty. McMillan stated that as a result, she felt "very strong about the death penalty alone."

McMillan also stated that she would hold the State to its burden of proving appellant's guilt beyond a reasonable doubt. She told the parties that she understood the State's burden of proof, and could apply it at both stages of the trial. When the defense took McMillan on voir dire, she was asked if she could put that one case "to one side and not use it as your guideline in this particular case? Can you do that?" McMillan replied, "I think I can." Soon after, trial counsel asked McMillan again if she "could put it aside and be a fair and impartial juror. Do you think you can?" McMillan stated, "Yes, I can."

We find that appellant has not shown this Court that his trial counsel was deficient in accepting McMillan as a juror in the instant case. In his brief, appellant asks a number of questions regarding how any intelligent attorney could ever accept McMillan in a capital case. On the contrary, our reading of the record of the voir dire of McMillan indicates that intelligent trial counsel would have had a difficult time justifying the use of a peremptory challenge against McMillan at this very early stage of the voir dire (McMillan was the third member of the venire called for voir dire). During voir dire, McMillan never stated that she had a predisposition in favor of the death penalty. Her answers showed her to be fair and open-minded regarding appellant's case, and willing to set aside her feelings regarding the violent crime

---

7. The purpose of the hearing was to determine if the court reporter inaccurately recorded the exchange between the trial court and Lee immediately prior to his decision to sustain the State's challenge for cause. The trial prosecutor recalled there was more to the trial court's question than the record reflected. However, the court reporter testified that she believed the record which she made of the exchange was accurate.

committed against a family friend. We find appellant has failed to meet the first prong of showing ineffective assistance of counsel in this matter: he has not shown his trial counsel to have been deficient in his assistance when he did not employ a peremptory challenge against McMillan. *Strickland v. Washington,* 466 U.S., at 693, 104 S.Ct., at 2067–2068; and *Hathorn v. State,* 848 S.W.2d, at 118.

■ Second, regarding the voir dire of McMillan, appellant argues that his trial counsel erred by "communicating to juror McMillan, ..., that he fully expected Appellant to be convicted and the death penalty assessed." We believe this to be an inaccurate reading and assessment of the voir dire of McMillan. We shall individually view the complained of remarks within the context of trial counsel's voir dire of McMillan.

Initially, appellant points to the following statement by trial counsel:

"You'll notice this lady is taking down every word that's said. In a capital murder case it's highly possible that when she gets all that typed up during the whole trial, puts it all into a bunch of books—called the "transcript"—it's possible that over the next six, seven, eight years that will be read by judge after judge after judge after judge. 25 or 30 judges, over a period of years, can conceivably read that record. It happens. We've got one, it's been kicking around for 12 years; and the judges are looking at one thing: Did these lawyers do their homework? Did they find out exactly how this potential juror felt?"

Within the context of trial counsel's voir dire of McMillan, this statement came during his introductory remarks to McMillan. He was explaining to her why he, as appellant's trial counsel, had to extensively question her about her opinion of, and feelings about, the death penalty. In this context, trial counsel's statement was intended solely to explain to McMillan the importance of these inquiries and why the voir dire was being extensively recorded by the court reporter. Trial counsel's references to a possible, eventual appeal referred only to the fact that an appellate court would look closely at the record of voir dire to determine if he, as trial counsel, made

a complete effort to ascertain McMillan's opinions of the death penalty. There was no explicit, or implicit, indication by trial counsel in this remark that he expected appellant to be convicted and the death penalty assessed. He indicated only that this was possible. Instead, this was a concerted and sincere effort to make McMillan aware of the importance of her answers, so that trial counsel could determine if McMillan's opinions of the death penalty made her worthy either of a challenge for cause or a defense peremptory challenge.

Later during the voir dire of McMillan, while trial counsel questioned her about what impact the experience of her friends would have upon her, trial counsel sought to determine whether she could set aside these personal impressions of the death penalty. It was during this questioning that another statement, which appellant complains about, occurred.

"Well, there, again, I get ugly because some seven years from now some federal judge will say, "Cannon, why didn't you find out whether or not the potential juror could put that aside?" And he'll be a lot tougher on me than I'll be on you."

This statement, also, was not an explicit, or implicit, indication by trial counsel that he expected appellant to be convicted. As with the first statement, this was a bona fide effort to determine if McMillan could set aside her personal feelings regarding the experiences of her friends, or if he needed to challenge her for cause or use a defense peremptory challenge on her. In both of these examples, appellant failed to meet the first prong of the test for ineffective assistance of counsel. Appellant has not shown that his trial counsel's questioning of McMillan in these two instances constituted deficient assistance. *Strickland v. Washington,* 466 U.S., at 693, 104 S.Ct., at 2067–2068; and *Hathorn v. State,* 848 S.W.2d, at 118.

In another example, appellant states that his counsel was ineffective because of his failure to make proper objections to the testimony from Dr. Narula concerning the autopsy performed by Dr. Bellas. Specifically, appellant complains that his trial counsel

failed to object on the basis of TEX.R.CRIM. EVID. 802 (the business records exception to the hearsay rule), or Rule 1002 (the best evidence rule).

As seen above in our analysis of point of error number seven, Dr. Narula's testimony regarding the autopsy report prepared by Dr. Bellas was properly admitted at trial. There was not a proper objection to have been made on the basis of either Rule 802 or Rule 1002. We do not believe appellant has met his burden of proof of showing his trial counsel's assistance was deficient under the first prong of *Strickland v. Washington.*

██ Appellant also points to an example wherein his trial counsel failed to object to the testimony of Detective Watson Davis. At the guilt-innocence stage of appellant's trial, Detective Davis testified that on August 27, 1986 he placed an all-points bulletin for a 1974 Buick two-door bearing Texas license plate number LBQ–612. Detective Davis then testified as to the exact information which he requested be dispatched in the bulletin:

> "Attention: All units be on the lookout for a 1974 faded blue Buick two-door with dark tinted windows displaying Texas LBQ 612. Vehicle was used in a capital murder of the Fashion Cleaners on Woodforest in District 3, 08–27 of '86, during an aggravated robbery.

> "Suspect is a negro male; 20 to 30 years of age; approximately 6 foot tall; weighing approximately 170 pounds; last seen wearing a blue, short sleeved pullover shirt and blue jeans. Suspect is believed to have committed several aggravated robberies in District 3 area and has used a blue steel revolver. If located, approach with caution. Suspect is armed and dangerous."

Appellant claims his counsel was ineffective because he failed to object to this testimony.

First, appellant asserts that the "all-points bulletin" testimony was objectionable as not being the best evidence under Rule 1002, id. However, this "all-points bulletin" was not a "writing, recording, or photograph," which are the types of evidence controlled by Rule 1002. It was an oral command from Davis to his dispatcher. At trial, Davis testified to the exact words of his own oral command to the dispatcher. It was not hearsay. It was also not a type of evidence controlled by Rule 1002.

Second, appellant claims the "all-points bulletin" testimony was objectionable as inadmissible evidence of extraneous offenses committed by appellant. Initially, we note that the bulletin was not offered as proof of the commission of any offense by appellant, not even the instant offense. It was only a vague and general description of a suspect who was seen driving a vehicle leaving the scene of the instant offense. The material regarding the instant offense and other offenses was included to support the cautionary warning to any potential arresting officer that the suspect was to be considered dangerous.

Assuming that trial counsel was deficient for not objecting to the admission of this testimony, appellant has failed to meet the burden of the second prong of *Strickland v. Washington.* Appellant has not shown this Court that but for this deficiency, the outcome of the proceeding would have been different. In spite of this oversight on appeal by appellant, this Court has reviewed the record to determine if the deficiency could have impacted on the outcome of the proceeding.

At trial, the State proved that after killing the deceased during a robbery of her at the Fashion Cleaners, witnesses saw the victim who, though mortally wounded, said she had been attacked and pointed at appellant who was seen fleeing the scene and getting into his car. Another witness pursued this car long enough to get a description of that car and its license plate number. After his arrest, appellant gave a signed and written confession in which he admitted to killing the deceased. In light of the vague and general wording of the bulletin remotely associating appellant with any extraneous offenses, and the weight of the evidence against him at the guilt-innocence stage of his trial, we cannot conclude that but for the deficiency, the outcome of his trial would have been different. *Hathorn v. State,* 848 S.W.2d, at 118.

Appellant also points to his trial counsel's failure to object to the testimony of Kathleen Shepard as another example of counsel's ineffective assistance. At the guilt-innocence stage of appellant's trial, Shepard testified that she was driving past the Fashion Cleaners on Woodforest when a slim, black male ran in front of her car. The only passenger in her car was her daughter. She then saw a woman come running out of the cleaners holding her side. Shepard saw that several people began chasing the black male. She turned her car into a bank's drive-through entrance where she saw the black male run, and began driving the direction she saw him run away. Shepard quickly made her deposit at the bank because she didn't have to wait in line. When she exited the bank, she saw the people still chasing the black male until he jumped in his car and drove off. She fell in behind him and followed him until she got his license plate number. Shepard returned to the Cleaners and gave the number to the officers at the scene.

Appellant claims his trial counsel should have objected to Shepard's testimony regarding the license plate number of appellant's car.

Q. (State): "Did you ever get the license plate number of the car?"

A. (Shepard): "I was concentrating on not hitting the car because I was awfully close to it, and I kept asking my daughter could she—"

TRIAL COURT: "Hold it a moment."

TRIAL COUNSEL: "We object. The answer isn't responsive to the question, Your Honor."

TRIAL COURT: "Sustained. Listen to the question very closely; and if it's a "yes" or "no" answer, give that, rather than something else."

Q. (State): "Ms. Shepard, can you tell me today: Do you know the license plate number of the car that you were following?"

A. (Shepard): "Yes."

Q. (State): "And what was that license plate number?"

A. (Shepard): "LBQ 612."

Appellant contends that trial counsel should have objected to Shepard's answers regarding the license plate number as being hearsay, citing TEX.R.CRIM.EVID. Rule 802.

Shepard's testimony established that she was in a good position to view appellant's car and obtain the license plate number. At no time did she testify as to any conversation between her and any other person regarding any statements made to her about the license plate number. Appellant's argument on appeal that her testimony was either hearsay or the fruit of hearsay is nothing more than supposition and guesswork on his part. There is no support in the record for this argument. We find appellant has not met the first prong of *Strickland* regarding this example. Appellant failed to establish that his trial counsel's assistance was deficient. *Hathorn v. State*, 848 S.W.2d, at 118.

Lastly, appellant presents the example of his trial counsel's closing argument at punishment as evidence of his counsel's ineffective assistance. Appellant points to places in the argument where trial counsel conceded appellant's actions in the instant offense. Appellant asserts that his trial counsel's plea for God's mercy for his client was, in effect, "the functional equivalent of an injunction to the jurors that they must answer all the special issues in the affirmative so that the death penalty would be assessed."

This Court finds appellant's argument on appeal to be a misrepresentation of the entire text of trial counsel's argument, and a misunderstanding of the obvious intent of that argument. At times in the argument, trial counsel conceded appellant's commission of the instant offense. This argument occurred at the punishment stage of appellant's trial, after his guilt of the instant offense had already been determined by the jury sitting to decide his penalty. Trial counsel conceded appellant's guilt as a basis for his argument that, in the eyes of God, two wrongs would not be able to make a right.

Throughout this argument, trial counsel extensively argued his theme that God's law ("thou shalt not kill.") was immutable, in contrast to the temporal nature of man's law. Trial counsel urged the jury to adhere to God's law, and not kill appellant. These

arguments led up to trial counsel's plea for mercy to be granted to appellant.

In his brief, appellant conveniently overlooks these aspects of his trial counsel's argument, so that he can highlight trial counsel's statements conceding the commission of the instant offense and the status of our current State law. Only in this limited view does trial counsel's argument appear to lead the jury to assess the death penalty. But this limited view is an out of context misrepresentation of trial counsel's sincere, good-faith efforts to save the life of appellant. We find appellant has failed to satisfy the first prong of *Strickland* regarding this example. He has not shown that trial counsel's argument was deficient.

When a totality of the circumstances is considered, appellant has not shown in the record that defense counsel was ineffective at trial nor has he shown that, but for his counsel's alleged deficiencies, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S., at 694, 104 S.Ct., at 2068; *Hathorn v. State*, 848 S.W.2d, at 121; *Black v. State*, 816 S.W.2d 350, at 357 (Tex.Cr.App.1991); *Butler v. State*, 716 S.W.2d 48, at 55 (Tex.Cr.App. 1986); and *Wilkerson v. State*, 726 S.W.2d 542, at 548 (Tex.Cr.App.1986), *cert. denied* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779. The record reflects that appellant's trial counsel conducted an effective defense for appellant. We cannot say from our reading of the record before us that trial counsel was ineffective. Appellant's tenth point of error is overruled.

The judgment of the trial court is affirmed.

MALONEY, J., concurs with note. Assuming under *Garcia v. State*, 868 S.W.2d 337 (Tex.Crim.App.1993), the Medical Examiner's autopsy report is not precluded from introduction under Tex.R.Crim.Evid. 803(8)(B) (law enforcement preclusion) and the facts of the report are admissible, it does not follow that the conclusions of that report over a hearsay objection are admissible. *See United States v. Rosa*, 11 F.3d 315 (2nd Cir.1993) (discussing *United States v. Oates*, 560 F.2d 45 (2nd Cir.1977), upon which we based our decision in *Cole v. State*, 839 S.W.2d 798 (Tex.Crim.App.1992)); Tex.

R.Crim.Evid. 803(8)(B) ("matters observed" by non-law enforcement personnel admissible); Tex.R.Crim.Evid. 803(8)(C) ("factual findings" against the state admissible). However, given the absence of a specific objection, I concur in the result.

McCORMICK, P.J., and BAIRD, J., not participating.

CLINTON, Judge, dissenting.

In his third point of error appellant contends the trial court erred in failing to dismiss the entire array and begin the whole voir dire anew, having found the prosecutor had exercised a peremptory challenge in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The majority concludes that dismissing only the "mini-panel" of which the erroneously challenged venireman was a part was sufficient to fully vindicate *Batson* interests because it "eliminat[ed] the group from jury selection that was directly associated with the State's racially discriminatory use of a peremptory challenge" against the venireman. Op. at 233. I do not know what this means or why it is dispositive of appellant's claim.

*Batson* was not a capital case, and its principles do not always translate readily into our particular method of capital voir dire. In capital voir dire jurors are selected by a process of elimination, as in non-capital cases, but not all at once by striking names from a list. Instead, in capital cases, after the trial court has voir dired the entire panel, each venireman is called individually in the order he appears on the list, and is passed first to the State for challenge or acceptance, and then to the accused. Article 35.13, V.A.C.C.P. When a venireman is struck by neither the State nor the accused, he is thereby selected to become a member of the jury, to be sworn in as soon as the remainder of the jury is likewise selected. Article 35.-22, V.A.C.C.P.

The problem with this process, from the perspective of deciding *Batson* error, *vel non*, is how to determine the point at which it can be said that an accused has established a prima facie case of discrimination by the

State. The State does not exercise its peremptories all at once at the end of voir dire. It is therefore impossible to know, at the time the State exercises its first peremptory challenge against a member of a protected class, be it racial, religious, gender-related, or some other, whether it presages a pattern of discrimination sufficient to make out a prima facie case. Indeed, even after a second, third or fourth such challenge, it is doubtful it can be determined with any degree of confidence that a prima facie case has been made out, since it is often impossible yet to know whether the protected class is being disproportionately excluded from jury service. See *Linscomb v. State,* 829 S.W.2d 164 (Tex.Cr.App.1992). Only after the voir dire is complete can it be said with certainty (and often not even then) that the State's peremptory challenges have been used to exclude members of a protected class to such disproportionate degree as to call for an explanation from the prosecutor why it should not be presumed that the disproportion is a product of his deliberate discrimination.

Therefore, it is a puzzle to me how the trial court was even able to conclude that appellant had established a prima facie case of discrimination in this cause. In a perfect world, the State should not have been required to explain its peremptory challenge against venireman Hadnott—or at least not until a pattern of discrimination had clearly emerged. In my view, the trial judge erred to hold there was a *Batson* error in the first place, at least at the time that he did. The State makes this argument in its reply brief. It does not, however, raise it by way of cross-appeal, as permitted by Article 44.01(c), V.A.C.C.P. That is presumably why the majority proceeds to the question whether the remedy for the supposed *Batson* error here was a permissible one—the State has not appealed the trial court's ruling that *Batson* error even occurred.

The majority concludes that Article 35.261, V.A.C.C.P., does not require dismissal of the entire array in this cause because that provision only applies to non-capital cases. This is an odd conclusion, if only because the State's brief concedes (whether correctly or not, I need not decide) that Article 35.261

*does* apply to capital as well as non-capital cases. My own view is that since appellant invoked the protections of the federal Equal Protection Clause, the trial court was not limited to the remedy embodied in Article 35.261 in any event. See *Curry v. Bowman,* 1993 WL 500500 (Tex.Cr.App., No. 71,606, delivered December 8, 1993) (State's motion for rehearing pending). The question simply becomes whether dismissing only the "mini-panel" was a permissible remedy under the Fourteenth Amendment.

Harris County's local practice of utilizing so-called "mini-panels" has been approved by this Court only in dicta, in *Hall v. State,* 661 S.W.2d 113 (Tex.Cr.App.1983), and then, only on the dubious authority of *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980). That dicta notwithstanding, this practice seems to violate Article 35.17, § 2, V.A.C.C.P., which provides for individualized questioning of veniremen, but contemplates that the entire panel "shall" first be questioned by the trial court as to certain enumerated principles, apparently as a body. It is therefore anomalous to rely on the existence of the local practice of "mini-panels" to avoid the remedy appellant seeks in this cause, *viz:* dismissal of the entire array.

Nevertheless, the majority describes dismissal of the "mini-panel" as "the most satisfactory method in the instant case to preserve appellant's rights to equal protection." Op. at 233. Of course, the. *most* satisfactory remedy for *Batson* error is the reinstatement of the excluded venireman, since that vindicates *both* the appellant's *and* the venireman's equal protection rights. See *Curry v. Bowman,* supra. I cannot agree, moreover, that dismissal of the "mini-panel" was a constitutionally acceptable remedy for *Batson* error, much less the "most satisfactory." Certainly dismissal of the array is an acceptable remedy under *Batson,* to the extent that it at least vindicates the accused's right, where he is the same race as the excluded venireman, to a jury untainted by prejudice against his kind. It hardly seems likely that dismissal of only a part of the array can remove that spectre, however. That a prima facie case of discriminatory use of peremptory challenges has been established *means,* of

course, that it is to be presumed, absent rebuttal from the State, that a like discriminatory purpose infected the whole of the voir dire process, not just some selective part. The prosecutor's inability to satisfy the trial court that his motives were race-neutral confirms that discriminatory purpose. If we accept the trial court's conclusion here, as the majority apparently does, that appellant conclusively established such a purpose, we do not provide sufficient constitutional succor when we also accept his conclusion that dismissal of only a portion of the product of that tainted process is an acceptable remedy.

I therefore respectfully dissent.*

---

* Responding to appellant's eighth point of error, the majority concludes the trial court erred in failing to instruct the jury to disregard witness Hartman's testimony. However, the majority concludes, the error was harmless under Tex. R.App.Pro., Rule 81(b)(2). In my view, for the same reason the majority concludes the error was harmless, it should have concluded the trial court committed no error in the first place.